IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE ESTATE OF ELAINE BOOKER, | : | CIVIL ACTION |
| DECEASED | : | |
| *BRANDI BOOKER, ADMINISTRATRIX* | : | No. 13-1099 |
| | : | |
| v. | : | |
| | : | |
| GREATER PHILADELPHIA HEALTH | : | |
| ACTION, INC., et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                    **March 31, 2014**

In this medical malpractice action, Plaintiff Brandi Booker, in her own right and as administratrix of the estate of her deceased mother, Elaine Booker, brings professional liability claims against Greater Philadelphia Health Action, Inc. (GPHA) and two GPHA physicians, Dr. Monica Mallory-Whitmore and Dr. Heather Ruddock.[1]  By virtue of GPHA's status as a federally funded community health center, it and its employees are entitled to medical malpractice liability coverage under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671-2680, if the Secretary of the Department of Health and Human Services (the Secretary or HHS) deems GPHA to be an employee of the Public Health Service for purposes of such coverage.  Upon receipt of a favorable deeming decision, GPHA and its employees are immunized from personal liability for malpractice claims so long as the allegedly negligent parties were acting within the scope of their employment and providing services within the scope of the center's federally funded activities.  If FTCA coverage applies, Plaintiff's exclusive remedy is against the United States.

---

[1] Because Plaintiff and her mother share the same surname, Brandi Booker is referred to herein as "Plaintiff" and Elaine Booker is referred to as "Ms. Booker."

In January 2013, HHS determined GPHA and Drs. Mallory-Smith and Ruddock were entitled to FTCA coverage in this case and requested that the United States Attorney for the Eastern District of Pennsylvania remove the case to federal court and substitute the United States as the Defendant.  When the Government did not appear, GPHA removed the case pursuant to 28 U.S.C. § 233(*l*)(2) in March 2013.   The United States, as the party GPHA seeks to have substituted as the sole Defendant in this action and thus the real party in interest, has filed a motion to remand, arguing GPHA's notice of removal was untimely and the services giving rise to Plaintiff's negligence claims are outside the scope of Defendants' FTCA coverage.  Although the issue raised by the Government's motion is whether there is *federal* malpractice coverage for Plaintiff's claims, as a practical matter, this issue may be dispositive of whether Defendants have any malpractice coverage at all, as neither Dr. Mallory-Whitmore nor Dr. Ruddock has private insurance.  Hr'g Tr. 46, Apr. 23, 2013.  Underscoring the significance of this issue, all three Defendants, as well as Plaintiff, oppose remand.  Upon consideration of the parties' legal memoranda and the arguments presented in court, and for the reasons set forth below, the Government's motion to remand will be denied.

**BACKGROUND**

GPHA is a Pennsylvania nonprofit, tax-exempt corporation that operates as a primary care clinic and offers health care services to residents of Philadelphia County and the surrounding areas.  Notice of Removal ¶ 6.  GPHA is a designated "community health center" that receives federal grant funds under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b.  *Id.*

From May 2003 until her death in April 2009, Ms. Booker worked for GPHA as an administrative assistant/customer service representative, primarily at GPHA's Woodland Avenue

Health Center location.  Am. Compl. ¶ 7; Decl. of Charles Joerger ¶ 6.  During her employment at GPHA, Ms. Booker was registered as a patient of the center and received health care services from center doctors on several occasions.  *See* Ex. to Pl.'s Opp'n to Mot. to Remand (GPHA "Patient Face Sheet" and progress notes).

In October and November, 2008, GPHA gave Ms. Booker a purified protein derivative (PPD) test and informed her the test came back positive, indicating she had been exposed to the bacterium that causes tuberculosis.[2]  *See* Am. Compl. ¶¶ 8-9.  After receiving the test results, Ms. Booker met with her non-GPHA primary physician, Dr. Luigi Cianci, who confirmed Ms. Booker did not have tuberculosis.  *Id.* ¶ 10.  Dr. Mallory-Whitmore and/or Dr. Ruddock, both of whom were employed by GPHA at the time,[3] thereafter prescribed the drug isoniazid for Ms. Booker as a precaution and told her to take it for three to six months.  *See* Am. Compl. ¶¶ 11-12. It is undisputed that Ms. Booker received the PPD test and isoniazid prescription as part of GPHA's Employee Health Program, which requires employees working in direct contact with or with occasional exposure to patients to undergo PPD screening every six months as a condition of their employment.  *See* Notice of Removal Ex. U, Attachment 2, at 7-8.  Under the Program, GPHA provides PPD screening free of charge to at-risk employees.  *Id.* at 2, 8.  For employees with positive PPD tests, GPHA also provides chest x-rays, prophylactic therapy, and monitoring. *See id.* at 2, 8-9.  Whether Ms. Booker was a "patient" of GPHA with respect to the services she received under the Employee Health Program is the substantive issue at the heart of the parties' dispute regarding the instant motion to remand.

_____

[2] The PPD test allegedly was administered in December 2008, Am. Compl. ¶ 8; however, the underlying records show Ms. Booker received the PPD test and related services in the October-November 2008 time frame, *see* Gov't's Mot. to Remand Ex. 5.

[3] Dr. Ruddock is no longer an employee of GPHA.  Notice of Removal ¶ 7.

Ms. Booker took the isoniazid as instructed for approximately four months.  On April 16, 2009, feeling ill, Ms. Booker saw Dr. Cianci, who advised her to go immediately to the hospital. Ms. Booker was admitted to Mercy Fitzgerald Hospital (Mercy) through the hospital's emergency room the same day "for possible drug-induced hepatitis along with consideration for viral hepatitis."  Am. Compl. ¶¶ 15, 19.  While at Mercy, Ms. Booker was transferred to the intensive care unit.  *Id.* ¶ 21.  Her condition worsened, and on April 20, 2009, Mercy transferred her to the Thomas Jefferson Liver Unit (Thomas Jefferson) for further evaluation and treatment, including evaluation as a candidate for a liver transplant.  *Id.* ¶¶ 23-24.  The following day, Ms. Booker experienced renal failure and was placed on dialysis.  *Id.* ¶ 26.  Two days later, on April 23, 2009, she was placed on a mechanical ventilator.  On April 24 or 25, 2009, Thomas Jefferson staff advised Ms. Booker's family that she "would likely die overnight."  *Id.* ¶ 33.  The family requested that she be removed from the ventilator and changed to "Do Not Resuscitate/Do Not Intubate" status.  *Id.*  Ms. Booker was thereafter placed on a morphine drip and was pronounced dead at 4:26 a.m. on April 25, 2009.  *Id.*  Her hospital discharge summary reflects a final diagnosis of "fulminant hepatic necrosis," and her attending physician noted she had developed hepatitis as a result of "INH [i.e., isoniazid] toxicity."  *Id.* ¶ 34.

On April 22, 2011, Plaintiff commenced this action by filing a praecipe to issue writ of summons in the Court of Common Pleas of Philadelphia County.  Notice of Removal Ex. B. Plaintiff filed her original Complaint on January 23, 2012, and filed an Amended Complaint seven months later, on August 27, 2012.[4]  In her Amended Complaint, Plaintiff alleges Dr. Mallory-Whitmore and Dr. Ruddock were negligent in treating Ms. Booker following her positive PPD test, including by inappropriately prescribing (or requesting that she be prescribed)

---

[4] Plaintiff did not name Dr. Ruddock in her original Complaint, but added Dr. Ruddock as a Defendant in her Amended Complaint.

isoniazid, and alleges GPHA was negligent in supervising, monitoring, and training Drs. Mallory-Whitmore and Ruddock. Plaintiff contends Defendants' negligence resulted in Ms. Booker's debilitating illness and eventual death.

After learning of Plaintiff's lawsuit, GPHA requested representation for itself and Drs. Mallory-Whitmore and Ruddock from HHS pursuant to the Federally Supported Health Centers Assistance Act (FSHCAA)[5] and the FTCA. As discussed in greater detail below, the FSHCAA makes a suit against the United States under the FTCA the exclusive remedy for medical negligence claims against public or private nonprofit entities receiving federal funds under 42 U.S.C. § 254b and employees of such entities in certain circumstances. Federally funded community health centers like GPHA are entitled to FTCA coverage for malpractice claims against themselves and their employees if the Secretary has deemed the entity and its employees to be employees of the Public Health Service for purposes of 42 U.S.C. § 233 with respect to the actions or omissions that are the subject of the underlying malpractice claims.

On November 22, 2011, HHS denied GPHA's request for representation. The agency acknowledged GPHA and its employees were deemed to be Public Health Service employees "in cases arising out of the provision of medical or related service, while acting within the scope of their employment," but because Dr. Ruddock was employed by GPHA as a pediatrician, the agency concluded the medical services Dr. Ruddock had provided to Ms. Booker in November 2008 were outside the scope of her employment.[6] Notice of Removal Ex. T. HHS issued a

---

[5] The original FSHCAA was enacted on a temporary basis in 1992. A new FSHCAA was enacted in 1995 to permanently extend and clarify the provisions of the earlier Act. Unless otherwise specified, references herein to the FSHCAA are to the 1995 Act.

[6] When HHS issued its denial of coverage letter on November 22, 2011, Plaintiff had not yet filed her Amended Complaint adding Dr. Ruddock as a defendant. Although GPHA's

further denial of coverage on July 9, 2012, on the basis that Ms. Booker had received the medical services and prescription medication at issue during an "Employee Health Fair," an activity outside the scope of GPHA's approved grant activities and thus outside the scope of the health center's FTCA coverage. *Id.*

In November 2012, GPHA requested reconsideration of HHS's denials of its request for representation in this case. As to the November 22, 2011, denial, GPHA argued that, contrary to HHS's finding, Dr. Ruddock was acting within the scope of her employment with GHPA when she provided services to Ms. Booker for two reasons. First, GPHA noted that in addition to granting Dr. Ruddock Level 4 (i.e., expert) privileges as a pediatrician, GPHA had granted her Level 2 privileges as a family practitioner, permitting her to manage "usual and uncomplicated cases," including the services provided to Ms. Booker. *See* Notice of Removal Ex. U & Attachment 1. Second, GPHA maintained Dr. Ruddock was acting within the scope of her employment as one of two Employee Health Officers for GPHA's Woodland Avenue Health Center, the GPHA site where Ms. Booker worked. GPHA observed that as an Employee Health Officer, Dr. Ruddock was responsible for providing services pursuant to the GPHA's Employee Health Program.

As to HHS's July 9, 2012, denial of coverage, GPHA argued the factual basis of the denial was incorrect because Ms. Booker did not receive services as part of an "Employee Health Fair." GPHA also took issue with HHS's suggestion that care provided to employees was outside its approved scope of project. In this regard, GPHA observed that under applicable

---

submission to HHS is not in the record, the Court infers that GPHA identified Dr. Ruddock as the physician responsible for Ms. Booker's isoniazid prescription.

Health Resources and Services Administration (HRSA)[7] policy, it was required to make services available not just to its target population of medically underserved persons, but also to all residents of its service area and to all those presenting for service with acute care needs, regardless of residence.  GPHA also maintained Ms. Booker was a patient of the health center pursuant to HRSA policy as she had "access[ed] care for initial or follow-up visits at approved sites that are owned or operated by the covered entity," i.e., GPHA.  *See id.* Ex. U.

On January 10, 2013, reversing its prior denial of coverage, HHS wrote to the United States Attorney for the Eastern District of Pennsylvania and requested that an Assistant United States Attorney (AUSA) be assigned to defend this case, remove the case to federal court, substitute the United States as the Defendant, and file a motion to dismiss for failure to exhaust administrative remedies.  The letter set forth HHS's determination that Dr. Mallory-Whitmore and Dr. Ruddock were employees of GPHA acting within the scope of their employment during the time frame alleged in the complaint, and enclosed HHS's file on the case, including letters reflecting that HHS had deemed GPHA eligible for FTCA coverage for the calendar years beginning January 1, 2007, January 1, 2008, January 1, 2009, and January 1, 2010.  *See* Notice of Removal Ex. V.  The letter also set forth HHS's conclusion that the allegations against GPHA and Drs. Mallory-Whitmore and Ruddock were covered by the FSHCAA, such that Plaintiff's exclusive remedy was provided by the FTCA.  *Id.*

When the United States Attorney did not promptly appear in state court following receipt of HHS's letter, GPHA removed the case pursuant to 42 U.S.C. § 233(*l*)(2).  Following a conference with the parties on April 23, 2013, the United States, as the real party in interest, filed

---

[7] HRSA is the agency within HHS that reviews health center applications for deemed status under the FSHCAA.  HRSA also issues policy regarding FTCA coverage under the FSHCAA.

the instant motion to remand the case to state court.  Procedurally, the Government argues the removal is untimely because GPHA's notice of removal was not filed within the 30-day period provided in 28 U.S.C. § 1446(b).  Substantively, Government argues that, contrary to HHS's determination, the services giving rise to Plaintiff's claims are outside the scope of services for which GPHA was deemed to be an employee of the Public Health Service and thus outside the scope of Defendants' FTCA coverage.  All parties oppose remand.

**DISCUSSION**

**A.    Statutory Framework**

Because an understanding of the applicable statutory framework is necessary to resolve the issues implicated by the Government's motion to remand, the Court will first review that framework in some detail.  Under the Public Health Service Act (PHSA), the exclusive remedy for personal injury damages resulting from the performance of medical functions by any officer or employee of the Public Health Service[8] while acting within the scope of his office or employment is a suit against the United States pursuant to the FTCA.  *See* 42 U.S.C. § 233(a). Section 233(a) thus "grants absolute immunity to [Public Health Service] officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct."  *Hui v. Castaneda*, 559 U.S. 799, 806 (2010).  When a Public Health Service employee is sued for medical negligence in state court, "[u]pon a certification by the Attorney General that the defendant was acting in the scope of his employment at the time of the incident out of which the suit arose," the state court action "shall be removed without bond at any time before trial by the Attorney General to the

---

[8] The Public Health Service includes the Office of the Surgeon General, the National Institutes of Health, the Bureau of Medical Services, the Bureau of State Services, and the Agency for Healthcare Research and Quality.  42 U.S.C. § 203.

district court of the United States of the district and division embracing the place wherein it is pending and the proceeding deemed a tort action brought against the United States under the provisions of Title 28." 42 U.S.C. § 233(c).

The 1992 FSHCAA amended the PHSA to extend § 233(a)'s grant of absolute immunity to certain federally funded community health centers and their employees[9] so as to enable the centers to redirect funds spent on malpractice insurance premiums toward patient care. *See* H.R. Rep. No. 102-823(II), at 4-6 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2627. Under the current FSHCAA, the Secretary can deem public or non-profit private entities receiving federal funds pursuant to 42 U.S.C. § 254b and employees of such entities to be employees of the Public Health Service for purposes of § 233(a). *See* 42 U.S.C. § 233(g)(1)(A) (providing the remedy against the United States for an entity or employee deemed to be an employee of the Public Health Service "shall be exclusive of any other civil action or proceeding to the same extent as the remedy against the United States is exclusive pursuant to [§ 233(a)]"). To obtain such deemed status for itself and its employees, an entity must submit an application to the Secretary verifying that it and its employees meet certain requirements. *See id.* § 233(g)(1)(A), (D). Upon receipt of an application pursuant to § 233(g)(1)(D), the Secretary must make a determination whether the entity and its employees are deemed to be employees of the Public Health Service within 30 days. *Id.* § 233(g)(1)(E). Pursuant to § 233(g)(1)(B), the Secretary's deeming decision applies with respect to services provided to all patients of the entity. Where an entity seeks to have a deeming determination apply with respect to services provided to individuals

---

[9] The FSHCAA also extends § 233(a)'s protections to health center officers, governing board members, and certain contractors. 42 U.S.C. § 233(g)(1)(A). Because it is undisputed that Drs. Mallory-Whitmore and Ruddock were both employees of GPHA, however, these additional categories are not discussed.

who are not patients of the entity, however, the application must include information from which the Secretary may determine that the provision of services to such individuals

> (i) benefits patients of the entity and general populations that could be served by the entity through community-wide intervention efforts within the communities served by such entity;

> (ii) facilitates the provision of services to patients of the entity; or

> (iii) are otherwise required under an employment contract (or similar arrangement) between the entity and an officer, governing board member, employee, or contractor of the entity.

*See id.* § 233(g)(1)(C), (D); H.R. Rep. No. 104-398, at 7 (1995), *reprinted in* 1995 U.S.C.C.A.N. 767, 771 (stating an entity's application for FTCA coverage from HHS "also will detail the situations in which health center practitioners treating non-registered patients of the center would be covered").

The Secretary's deeming determination pursuant to § 233(g)(1)(E) applies for one calendar year and is "final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding."  *See* 42 U.S.C. § 233(g)(1)(A), (E), (F).  Subject to one exception not applicable here, once the Secretary deems an entity to be a Public Health Service employee pursuant to § 233(g)(1)(E), "the Secretary and the Attorney General may not determine that the provision of services which are the subject of such a determination are not covered under this section."  *Id.* § 233(g)(1)(F).

When a medical malpractice action is filed in state court against a federally funded community health center or its employees, the statute contemplates that within 15 days after being notified of the filing, the Attorney General "shall make an appearance in such court and advise such court as to whether the Secretary has determined under [§ 233(g) and (h)] that such entity . . . [or] employee . . . is deemed to be an employee of the Public Health Service for

purposes of this section with respect to the actions or omissions that are the subject of such civil action or proceeding." *Id.* § 233(*l*)(1). If the Attorney General appears and advises the court affirmatively, "[s]uch advice shall be deemed to satisfy the provisions of [§ 233(c)] that the Attorney General certify that an entity . . . [or] employee . . . of the entity was acting within the scope of their employment or responsibility." *Id.* Although § 233(*l*)(1) directs the Attorney General to act within 15 days after being notified of a malpractice action, the Government retains the authority to remove the action to federal court "at any time before trial" pursuant to § 233(c). *See Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 81-82 (2d Cir. 2005) (holding § 233(*l*) "establishes *additional* certification opportunities for federally funded health centers beyond those granted by § 233(c)" and thus does not abrogate § 233(c) (emphasis added)). If the Attorney General fails to act within the 15-day period specified in § 233(*l*)(1), however, the defendant entity or employee may remove the case, whereupon the case shall be stayed until the federal court "conducts a hearing, and makes a determination, as to the appropriate forum or procedure for the assertion of the claim for damages . . . and issues an order consistent with such determination." 42 U.S.C. § 233(*l*)(2).

### B.   Timeliness of Removal

Section 233(*l*)(2) authorizes removal of a state court malpractice action by a defendant health center or its employee after 15 days have elapsed since the Attorney General was notified of the suit, *see Celestine*, 403 F.3d at 82, but does not specify an outer limit on the time to remove. The Government argues in the absence of a specific deadline in § 233(*l*)(2) itself, the timeliness of removal is governed by the general removal statute, 28 U.S.C. § 1446(b), which requires a defendant to file a notice of removal "within 30 days after the receipt by the defendant . . . of a copy of the initial pleading setting forth the claim for relief upon which such action or

proceeding is based," *id.* § 1446(b)(1), or, "if the case stated by the initial pleading is not removable, . . . within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable," *id.* § 1446(b)(3). The Government assumes, for purposes of its motion to remand, that the 30-day window for removal was not triggered until 15 days after the Attorney General was notified of this action and failed to appear in state court under § 233(*l*)(1), but argues the notice of removal is nevertheless untimely because the 30-day removal period expired on February 25, 2013, four days before GPHA filed its notice of removal in this case on March 1, 2013.[10]

GPHA and Plaintiff do not dispute the Government's calculations, but instead argue the structure of § 233 and the purpose for which § 233(*l*)(2) was added to the statute reflect congressional intent to afford community health center defendants the same right to remove a case "at any time before trial" that the Attorney General enjoys under § 233(c).

As the parties acknowledge, case law regarding the time frame for removal pursuant to § 233(*l*)(2) is exceedingly sparse. The Government relies on *Allen v. Christenberry*, 327 F.3d 1290 (11th Cir. 2003), in which the Eleventh Circuit held removals pursuant to § 233(*l*)(2) are subject to § 1446(b)'s 30-day time limit. In *Allen*, two doctor-defendants in a state court

---

[10] The Government calculates the 15-day period for the Attorney General to appear in state court and the 30-day removal period using January 10, 2013, the date HHS wrote to the United States Attorney, as a starting point. Because the United States Attorney did not receive the HHS letter until the following day, however, *see* Gov't's Mot. to Remand Ex. 1, January 11, 2013, would appear to be a more appropriate starting point. *See* 42 U.S.C. § 233(*l*)(1) (directing the Attorney General to appear "within 15 days after being notified of such filing"). Even using this later date, the notice of removal would be untimely under the Government's approach, as the Attorney General would have had until January 28, 2013 (the Monday after the 15-day period lapsed the preceding Saturday), to appear in state court, and the 30-day removal period (insofar as it applies) would have expired on February 27, 2013, two days before the instant notice of removal was filed.

malpractice action removed the case pursuant to § 233 (among other statutes) on the eve of trial, more than four years after the case was filed.  Although the doctors had attempted to have HHS or the Department of Justice defend the suit at the outset, their communications with HHS ceased a few months after the suit was filed.  Four years later (and ten days before the scheduled trial date), the doctors wrote to the Department of Justice requesting that the Attorney General certify they were acting within the scope of their federal employment and move to substitute the United States as a defendant under the FTCA.  The United States Attorney thereafter filed a notice in state court, stating the Attorney General had first been notified of the lawsuit only days earlier and indicating the issue of whether the doctors were to be deemed Public Health Service employees was then under consideration by HHS.  The next day, the doctors removed the case to federal court.

On appeal from the district court's denial of the plaintiff's motion to remand the case, the Eleventh Circuit held the removal was improper pursuant to § 233(*l*) because the Attorney General had neither notified the court that HHS had determined the doctors were deemed Public Health Service employees nor failed to appear in state court within 15 days of being notified of the suit.  *Id.* at 1295.  In so holding, the court also rejected the doctors' attempt to salvage their argument under § 233(*l*)(2) on the basis that the Attorney General actually had received notice of the lawsuit years earlier, as the Department of Justice had been copied on their initial correspondence with HHS.  The court observed that because § 233(*l*)(2) itself does not specify a time limit for removal, the matter is "left to the general removal statute," i.e., § 1446(b), and

went on to suggest that "[i]f the Attorney General was notified in 1997, as [the doctors] contend, they had thirty days from that notification in which to remove this case." *Id.*[11]

Although the parties have not cited (and this Court has not found) any other reported cases squarely addressing this issue, the D.C. Circuit has suggested (albeit in dicta) that the approach advocated by the Government and approved by the Eleventh Circuit is not the only conceivable approach. Addressing the extent to which the removal remedy under § 233(*l*)(2) permits independent district court review of the Secretary's negative coverage determinations, the court observed that given the provision's silence on the time frame within which a defendant must petition for removal, "[s]everal approaches [were] possible," including importing § 1446(b)'s 30-day limit, "triggered after the expiration of the Attorney General's 15-day period to appear," or, alternatively, relying on the doctrine of laches and "barring removal for unreasonable delay." *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1274 (D.C. Cir. 2005).

Notwithstanding the Eleventh Circuit's holding to the contrary in *Allen*, this Court is not persuaded § 1446(b)'s 30-day time limit applies to removals pursuant to § 233(*l*)(2). Section 233(*l*)(2) was not part of the 1992 FSHCAA; thus, when the 1992 Act initially extended FTCA coverage to federally funded community health centers and their employees, the sole removal procedure was certification by the Attorney General "at any time before trial" pursuant to § 233(c). The fact that § 233(*l*)(2) was added to a statutory scheme in which suits against health

---

[11] The court's suggestion that the 30-day removal period would run from the date the Attorney General was notified appears to contravene the text of § 233(*l*)(2), which does not permit removal by a defendant entity or employee until after the Attorney General has failed "to appear in State court within the [15-day] time period prescribed under paragraph (1)."

centers were removable at any time before trial provides a basis to infer that Congress intended the same time frame to govern removals by the health centers themselves.[12]

Moreover, the 1995 FSHCAA added § 233(*l*) to address concerns about delays by the Department of Justice in processing malpractice claims and in appearing on behalf of deemed entities and employees in state court, which delays had "resulted in at least one default judgment against a health center involving a claim that later was determined to be covered under the FTCA." H.R. Rep. No. 104-398, at 7, *reprinted in* 1995 U.S.C.C.A.N. at 771; *see also id.* at 11-12, 1995 U.S.C.C.A.N. at 775 (noting the failure of the Attorney General to timely remove an action against a deemed health center could result in a default judgment against the center). To remedy this problem, § 233(*l*) required the Attorney General to appear in state court within 15 days after being notified of a suit against a health center and permitted the health center to remove the case in the event the Attorney General failed to timely appear. *Id.* at 11-12, 1995 U.S.C.C.A.N. at 775-76; *see also El Rio Santa Cruz Neighborhood Health Center*, 396 F.3d at 1272 (noting the legislative history indicates § 233(*l*)(2) was intended to protect covered defendants against default judgments due to the Attorney General's untimeliness). In this context, where Congress sought to expand § 233's existing removal procedure to permit health centers and their employees to protect themselves against the risk of a default judgment, the failure to specify an outer limit on the time for removal cannot be read to incorporate § 1446(b)'s

---

[12] The fact that § 233, of which § 233(*l*)(2) is a part, permits removal by the Attorney General at any time before trial also distinguishes this case from the cases cited by the Government in which courts have applied § 1446(b)'s 30-day time limit to other federal statutes that confer a right of removal without specifying a time frame in which the right must be exercised. In both *Haag v. Webster*, 434 F. Supp. 2d 732 (W.D. Mo. 2006), and *Mtech Corp. v. FDIC*, 729 F. Supp. 1134 (N.D. Tex. 1990), the statute at issue included a provision making certain actions removable, but was entirely silent regarding the timing of removal. Neither case involved a situation like that presented here, where Congress was legislating in the context of a pre-existing removal right exercisable at any time before trial.

30-day limit.  It would make no sense to restrict health centers' ability to protect themselves in this manner, particularly when the centers may not be aware of the date on which the Attorney General was notified of the suit.[13]

Even if § 233(*l*)(2) removals were subject to equitable limitations such as laches, a possibility the court entertained in the *El Rio Santa Cruz Neighborhood Health Center* case, there is no basis to conclude GPHA delayed unreasonably in removing this case.  Upon learning of this lawsuit, GPHA promptly requested representation for itself and Drs. Mallory-Whitmore and Ruddock from HHS.  When HHS denied the request, GPHA sought reconsideration of the denials, eventually obtaining a favorable coverage determination from HHS on January 10, 2013, in which HHS requested that an AUSA be assigned to appear and defend the case.  Less than two months later, the Government having failed to appear in state court, GPHA removed the case.  In these circumstances, GPHA cannot be regarded as having delayed unreasonably in filing a notice of removal.

Because the Court concludes removals pursuant to § 233(*l*)(2) are not subject to a 30-day time limit, and because GPHA did not delay unreasonably in removing this case, the Court finds GPHA's removal was timely.

### C.    Scope of FTCA Coverage

The Government argues even if GPHA timely removed this case, the case must nevertheless be remanded because the services giving rise to Plaintiff's malpractice claims are outside the scope of services for which HHS deemed GPHA and its employees to be employees

---

[13] Section 1446(b) is an awkward fit with § 233(*l*)(2) for the additional reason that while § 1446(b) contemplates the 30-day period will run from the *defendant*'s receipt of a pleading or other paper from which it can be ascertained that the case is removable, § 233(*l*)(2) authorizes the defendant to act only after 15 days have expired following the *Attorney General*'s receipt of notification of the suit, a date that may not always be readily discernible.  The Government's approach would have the Court apply 30-day limit, but run it from different starting point.

of the Public Health Service, and are thus outside the scope of GPHA's FTCA coverage.  In the Government's view, services provided to GPHA employees as part of the center's Employee Health Program are not *patient* services within the meaning of § 233(g)(1)(B) and GPHA was therefore required to seek approval of the Program pursuant to § 233(g)(1)(C) (concerning services provided to individuals who are *not* patients of an entity) for GPHA and its employees to be deemed Public Health Services employees with respect to such services.  Because GPHA did not seek approval of its Employee Health Program pursuant to § 233(g)(1)(C), the Government argues services provided under the Program are outside the scope of GPHA's FTCA coverage.

GPHA and Plaintiff dispute the premise of the Government's argument, i.e., that Ms. Booker was not a patient of GPHA for purposes of the PPD screening and related services she received under the Employee Health Program, observing Ms. Booker qualifies as a patient under applicable HRSA policy because she established a patient-provider relationship with GPHA by accessing care at a GPHA facility.  GPHA and Plaintiff also argue HHS's favorable coverage determination, reflected in its January 10, 2013, letter to the United States Attorney, is final and binding on all parties, including the Government, pursuant to § 233(g)(1)(F).  The Court must therefore address, as a preliminary matter, whether HHS's January 10 letter is dispositive on the issue of Defendants' FTCA coverage.

Under § 233(g)(1)(F), "[o]nce the Secretary makes a determination that an entity or . . . employee . . . of an entity is deemed to be an employee of the Public Health Service for purposes of this section, the determination shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding."  As set forth above, the statute contemplates the Secretary will make the deeming determination referenced in § 233(g)(1)(F)

within 30 days after receipt of an entity's application for such deemed status pursuant to § 233(g)(1)(D).  *See* 42 U.S.C. § 233(g)(1)(E) ("The Secretary shall make a determination of whether an entity or . . . employee . . . of the entity is deemed to be an employee of the Public Health Service for purposes of this section within 30 days after the receipt of an application under subparagraph (D).").  Here, the Secretary issued a series of favorable deeming determinations to GPHA, deeming GPHA to be an employee of the Public Health Service for successive one-year periods beginning January 1 of each year from 2008 to 2012, based on the information provided in GPHA's deeming applications.  *See* Notice of Removal Ex. S (deeming notifications for the foregoing calendar years).  The Government does not dispute these deeming determinations are final and binding on all parties pursuant to § 233(g)(1)(F).  Rather, the Government contends it retains authority under § 233(c) to decide whether these deeming determinations encompass the services giving rise to Plaintiff's malpractice claims.  *Cf.* 42 U.S.C. § 233(g)(1)(F) (providing a favorable deeming determination precludes the Secretary and the Attorney General from "determin[ing] that the provision of services which are the subject of such a determination are not covered under this section," but implicitly suggesting the Secretary and the Attorney General may dispute coverage as to the provision of services outside the scope of the Secretary's deeming determination).

GPHA and Plaintiff argue § 233(g)(1)(F) also applies to the coverage decision reflected in HHS's January 10, 2013, letter to the United States Attorney.  The January 10 letter, however, is not a deeming determination but a determination by HHS that its earlier deeming determinations apply to the facts and circumstances of this case.  Underscoring this point, the letter encloses copies of the Secretary's earlier deeming decisions for calendar years 2007 to 2010.  *See* Notice of Removal Ex. V.  The letter reflects HHS's conclusion that based on these

prior deeming decisions and its determination that Dr. Mallory-Whitmore and Dr. Ruddock were "employees of [GPHA], and acting with the scope of their employment during the time alleged in the complaint," Plaintiff's allegations in this case "are covered by the FSHCAA, and the exclusive remedy is provided by the FTCA." *See id.* But because this conclusion is not a deeming determination pursuant to § 233(g)(1)(E), it is not "final and binding" on the parties pursuant to § 233(g)(1)(F).[14]

---

[14] Although the Court agrees with the Government that § 233(g)(1)(F) does not preclude the Attorney General from arguing the activities underlying Plaintiff's malpractice claims are outside the scope of activities to which HHS's deeming decisions apply, the fact that HHS issued a favorable coverage determination after considering GPHA's requests for representation and for reconsideration raises the question whether HHS's resolution of the coverage issue is nevertheless entitled to deference. The statute itself is ambiguous on this question. Section 233(*l*) directs the Attorney General to appear in state court within 15 days after being notified of a suit against a federally funded community health center to advise the court "as to whether *the Secretary* has determined under subsections (g) and (h) of this section that such entity . . . [or] employee . . . of the entity is deemed to be an employee of the Public Health Service for purposes of this section with respect to the acts or omissions that are the subject of such civil action or proceeding." 42 U.S.C. § 233(*l*)(1) (emphasis added). This provision could be read to suggest the determination whether coverage exists in a particular case is for the Secretary, and that the Attorney General's role is limited to communicating the Secretary's coverage decision. *See also id.* (providing the Attorney General's advice regarding the Secretary's determination "shall be deemed to satisfy" the Attorney General's scope-of-employment certification under § 233(c)). There is good reason to defer to HHS on this issue, given the agency's role in reviewing and approving applications for deemed status.

Because the provision refers to the Secretary's determinations "under subsections (g) and (h) of this section," which relate to the Secretary's action on an application for deemed status under § 233(g)(1)(D), however, the provision could also be read to permit the Attorney General to determine whether any deeming decision by Secretary applies with respect to the acts or omissions at issue in the civil action, akin to the scope-of-employment certification the Attorney General makes under § 233(c). Notably, HRSA's Federal Tort Claims Act Health Center Policy Manual suggests the Secretary and the Attorney General share responsibility for coverage decisions. *See* HRSA Policy Information Notice 2011-01, Federal Tort Claims Act Health Center Policy Manual, at 21 (Jan. 3, 2011), available at http://bphc.hrsa.gov/policiesregulations/policies/pdfs/pin201101manual.pdf (last accessed Mar. 31, 2014) ("The applicability of FTCA to a particular claim or case will depend upon verification by HHS OGC and/or certification by the United States Attorney, as appropriate, that [the requirements for coverage are met].") Because the Court concludes Defendants are entitled to FTCA coverage even if HHS's coverage determination is not entitled to any deference, the Court need not resolve this issue.

As to the merits, the disputed issue in this case is a narrow one.  The Government does not dispute Dr. Mallory-Whitmore and Dr. Ruddock were acting within the scope of their employment with respect to the acts and omissions giving rise to Plaintiff's malpractice claims. The Government likewise does not dispute that the services at issue in this case (i.e., a PPD test and related services, including a prescription for isoniazid) are covered services that GPHA is authorized to provide to patients under its Section 330 Grant.  *See* Gov't's Mot. to Remand Ex. 7 (excerpts from GPHA's Section 330 grant application listing "TB Therapy" and "Diagnostic Tests/Screens" among the services provided by GPHA).  For its part, GPHA does not dispute the services at issue were provided to Ms. Booker as part of GPHA's Employee Health Program. Because the Secretary's deeming decision applies with respect to services provided "to all patients of the entity" under § 233(g)(1)(B), the dispositive issue is whether Ms. Booker was a patient of GPHA for purposes of the services she received under the Employee Health Program.

Although the statute draws a distinction between services provided to patients and non-patients for purposes of FTCA coverage, it does not define the term "patient."  The regulations implementing § 233 provide examples of situations in which health centers are required to seek separate approval of services provided to non-patients to obtain FTCA coverage for such services, but the examples do not speak to the situation in which services are provided to health center employees.[15]  Under applicable HRSA policy, the requirement of providing services to health center patients is met when a patient-provider relationship is established, i.e., when:

---

[15] The regulation suggests non-patient services for which a health center would be required to seek separate approval include the center's operation of a school-based or school-linked health program, the provision of occasional hospital emergency room coverage by center physicians as a condition of obtaining staff privileges at the hospital, and the provision of after-hours coverage of another facility as part of a cross-coverage arrangement with the facility.  *See* 42 C.F.R. § 6.6(e).  None of these examples involves the provision of services at the health center to center employees.

- Individuals access care for initial or follow-up visits at approved sites that are owned or operated by the covered entity;

- Individuals access care at approved sites even if they are not permanent residents of the service area or may only be receiving care temporarily; or

- Health center triage services are provided by telephone or in person, even when the patient is not yet registered with the covered entity but is intended to be registered.

HRSA Policy Information Notice 2011-01, Federal Tort Claims Act Health Center Policy Manual, at 8.

Here, Ms. Booker plainly accessed care for initial and follow-up visits at GPHA's Woodland Avenue Health Center when she received the PPD test and subsequent prescription for isoniazid. As a resident of GPHA's service (or "catchment") area, Ms. Booker was part of the population GPHA served under its Section 330 grant, and, in fact, Ms. Booker was a registered patient of the center. *See* Decl. of Ronald Heigler ¶ 12 (stating Ms. Booker lived within GPHA's service area during her employment with GPHA). The Court therefore concludes Ms. Booker was a patient of GPHA, including for purposes of the PPD-related services she received as part of the Employee Health Program.

The Government does not dispute Ms. Booker was a patient of GPHA for some purposes during the relevant time frame, but argues she was not a patient for purposes of the PPD-related services at issue in this case because GPHA documented those services in her employee health file, not in her medical record. It is not at all apparent, however, why this administrative designation should be dispositive of Ms. Booker's patient status. Under its Employee Health Program, GPHA provides certain services, including PPD screening and evaluation and

management of PPD conversion, free of charge to full- and part-time GPHA employees.[16]  *See* Notice of Removal Ex. U, Attachment 2, at 2, 7-9.  Services provided to GPHA employees under the Employee Health Program are to be documented in the employee's "EHP file," rather than in the employee's medical record; however, EHP files are to be stored in the Medical Record Department of the GPHA site where the employee works and are to be handled and protected according to usual HIPAA/confidentiality standards.  *Id.* at 4.  While EHP files are treated differently from medical records under the Employee Health Program, there is no indication the existence of separate EHP files is intended to signify employees are not patients of GPHA for purposes of the services they receive under the Program.  Rather, the Program description suggests at least one reason for the separate recordkeeping is to ensure all documentation regarding an employee's immunizations, PPD screening, and other Employee Health Program services is available in a single file that is readily portable in the event an employee is assigned or transferred to another GPHA site.  *See id.*

Notwithstanding the Employee Health Program's separate recordkeeping requirement, GPHA documented PPD-related services in Ms. Booker's medical record on at least three prior occasions.  *See* Ex. to Pl.'s Opp'n to Mot. to Remand (progress notes indicating Ms. Booker was PPD-negative in December 2003 and referencing orders for "PPD" as part of her "bi-annual tb screen" in October 2004 and March 2005).  Ms. Booker's medical record also references a visit on November 25, 2008, at which Ms. Booker saw medical staff for dental pain and received a prescription for amoxicillin.  *See* Gov't's Mot. to Remand Ex. 9.  Although the Government

---

[16] Consistent with the Program's purpose "to reduce the risk of occupational acquisition and blood-borne disease and to provide early detection of PPD conversion so that appropriate follow-up and prophylaxis can be instituted," the services provided as part of the Employee Health Program include PPD-related services as well as certain vaccines and services related to the identification and management of occupational exposure to hepatitis B, hepatitis C, and HIV. *See* Notice of Removal Ex. U, Attachment 2, at 2.

maintains this visit has nothing to do with Plaintiff's claims in this lawsuit, the visit occurred after Ms. Booker received the prescription for isoniazid and during the period when Defendants allegedly failed to monitor her, and it is therefore possible this visit is part of Plaintiff's claim.

Because Ms. Booker was a patient of GPHA with respect to the services at issue in this case, and because it is undisputed the other requirements for FTCA coverage are met in this case, Defendants are entitled to FTCA coverage with respect to the acts and omissions giving rise to Plaintiff's malpractice claims.  Accordingly, the Government's motion to remand will be denied and the United States will be substituted for GPHA, Dr. Mallory-Whitmore, and Dr. Ruddock as the Defendant in this action

An appropriate order follows.

BY THE COURT:


    /s/ Juan R. Sánchez
Juan R. Sánchez, J.